**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**UNITED STATES OF AMERICA upon the
Relation and for the use of the TENNESSEE
VALLEY AUTHORITY**                                                    **PLAINTIFF**

**V.**                                                    **CIVIL ACTION NO. 3:22-CV-108-RP**

**EASEMENTS AND RIGHTS-OF-WAY OVER
3.94 ACRES OF LAND, MORE OR LESS, IN
DESOTO COUNTY, MISSISSIPPI, et al.**                              **DEFENDANTS**

**ORDER GRANTING MOTION TO EXCLUDE
OPINION TESTIMONY OF WILLIAM N. SEXTON**

This matter is before the court on the Government's motion to exclude the opinion

testimony of the defendant Golf, Inc.'s retained expert William N. Sexton.   ECF #67.   Golf,

Inc. has designated Sexton as a retained expert witness who at trial will offer his appraisal of the

value of the property rights taken in this condemnation action, and the Government moves to

exclude Mr. Sexton's testimony on a number of grounds, primarily on the grounds that in

reaching his opinion Mr. Sexton did not use the appraisal methodology that is required in federal

condemnation proceedings in the Fifth Circuit.   Golf, Inc. opposes the motion.   For the reasons

below, the court finds that the Government's motion is well taken and should granted.

**Facts and Procedural Background**

Golf, Inc. owns 212.31 acres of land in DeSoto County, Mississippi, comprised of five

tax map parcels, on which Golf, Inc. operates a public golf course.   The United States of

America, upon the relation and for the use of the Tennessee Valley Authority ("TVA"), brought

this condemnation action in connection with a Tennessee Valley Authority transmission line

project to acquire permanent easements and rights-of-way across certain parcels of Golf, Inc.'s

property for the purpose of building and maintaining electric power and communications circuits

and removing trees on the property as needed to protect the transmission line structure or conductor from damage from falling trees. The subject easements and rights-of-way cross three of Golf, Inc.'s five parcels and encumber 3.94 acres of land. All potentially interested party defendants other than Golf, Inc. have disclaimed their rights to any compensable interest in the case, and the court has entered an Order of Possession. The sole remaining issue to be adjudicated is the amount of just compensation to be awarded to Golf, Inc. for the property rights that were taken.

Whereas the Government has deposited funds with the court in the mount of $97,700 as its estimate of the compensation to be awarded, Golf, Inc. contends $1.4 million is owed and in support relies on the disclosed opinions of its retained expert William Sexton. The Government now moves for the exclusion of Sexton's testimony under Rule 702 of the Federal Rules of Evidence.

## **Admissibility of Expert Testimony**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 charges the trial judge with a gatekeeping obligation to ensure that any and all testimony based on scientific, technical, or other specialized knowledge "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786,

125 L.Ed.2d 469 (1993). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight v. Kirby Inland Marine Inc.,* 482 F.3d 347, 355 (5th Cir. 2007) (quoting *Heller v. Shaw Indust., Inc.,* 167 F.3d 146, 155 (3d Cir. 1999)). "[T]he expert's testimony must be reliable at every step or else it is inadmissible." *Knight,* 482 F.3d at 355.

As to an expert's methodology, the court's gatekeeping obligation requires it "to make a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Bear Ranch, L.L.C. v. Heartbrand Beef, Inc.,* 885 F.3d 794, 802 (5th Cir. 2018) (quoting *Daubert,* 509 U.S. 592-93). "This requires some objective, independent validation of the expert's methodology." *Moore v. Ashland Chemical Inc.,* 151 F.3d 269, 276 (5th Cir. 1998). The expert's assurances as to the validity of his methodology are insufficient. *Id.*

As to the facts underlying an expert's opinion, "[w]here an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.,* 555 F.3d 383, 388 (5th Cir. 2009). Expert opinions that are unsupported by data, are self-contradicted, or are based on incorrect assumptions are to be excluded. *See Guile v. United States,* 422 F.3d 221, 227 (5th Cir. 2005). Although trained experts commonly extrapolate from existing data, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *see also Guile,* 422 F.3d at 227 ("A claim cannot stand or fall on the mere *ipse dixit* of a credentialed witness.") (quoting *Archer v. Warren,* 118 S.W.3d 779, 782 (Tex. App. – Amarillo

2003)). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co.,* 522 U.S. at 146.

There is no formula for determining whether expert testimony is reliable or unreliable, "and the court must judge admissibility based on the particular facts of the case." *Wells v. SmithKline Beecham Corp.,* 601 F.3d 375, 379 (5th Cir. 2010). The gatekeeping role of the district court is particularly pronounced in condemnation proceedings under Rule 71.1 [of the Federal Rules of Civil Procedure]." *United States v. 33.92356 Acres of Land,* 585 F.3d 1, 8 (1st Cir. 2009); *see also United States v. Reynolds,* 397 U.S. 14, 20, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970) (stating that "the sweeping language of the final sentence of [Rule 71.1] discloses a clear intent to give the district judge a role in condemnation proceedings much broader than he occupies in a conventional jury trial"). Still, the court should exercise caution when considering whether to exclude a valuation expert's opinion in condemnation proceedings.

> The value of property taken by the Government, which is no longer on the market, is largely a matter of opinion. Since there are no infallible means for determining with absolute conviction what a willing buyer would have paid a willing seller for the condemnee's property at the time of taking, eminent domain proceedings commonly pit the Government's valuation experts against those of the landowner. Thus, the exclusion of one or all of either party's proposed experts can influence substantially the amount of compensation set by the factfinder. Not only does the landowner have a strong interest in receiving just compensation for property, the public as well has vested interests in insuring that the Government does not pay more than what the owner justly requires. Recognizing the critical role of expert witnesses in these cases and the strong interest on both sides that compensation be just, trial courts should proceed cautiously before removing from the jury's consideration expert assessments of value which may prove helpful.

*United States v. 14.38 Acres of Land, More or Less, in Leflore County, State of Miss.,* 80 F.3d 1074, 1077-78 (5th Cir. 1996) (quoting *United States v. 68.94 Acres of Land, More or Less, Situate in Kent County, State of Del.,* 918 F.2d 389, 393 (3rd Cir. 1990)).

**Just Compensation**

"Just compensation" generally means the "fair market value of the property taken on the date it is appropriated." *Kirby Forest Industries, Inc. v. U.S.,* 467 U.S. 1, 10, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984). In cases such as the present one, where the estate taken is less than absolute ownership, such as an easement, the compensation to be paid for the rights taken "is the difference between the fair market value of the land as a whole with and without the burden." *U.S. ex rel. Tenn. Valley Auth. v. Robertson,* 354 F.2d 877, 880 (5th Cir. 1966).

Fair market value is generally defined as "what a willing buyer would pay in cash to a willing seller." *United States v. 50.822 Acres of Land,* 950 F.2d 1165, 1168 (5th Cir. 1992). Fair market value is determined at the time of taking. *United States v. 320.0 Acres of Land,* 605 F.2d 762, 781 (5th Cir. 1979). "The best evidence of market value is comparable sales – i.e., sales from a willing seller to a willing buyer of similar property in the vicinity of the taking at or about the same time as the taking." *United States v. 8.41 Acres of Land,* 680 F.2d 288, 395 (5th Cir. 1982).

**Opinion Testimony of William Sexton**

During discovery in this case, Golf, Inc. designated as its retained expert William Sexton, a licensed Mississippi appraiser, who provided a written report containing his opinion of the just compensation that should be awarded to Golf, Inc. for the property rights taken by the plaintiff.[1] In the narrative section of his report, Sexton explains that in order to determine the just compensation for the easement taken, it was first necessary to calculate the "before easement" value of the subject property, after which just compensation was calculated "by adding the

---

[1] Mr. Sexton later amended his report to correct an error in one of his calculations, and further references herein to Mr. Sexton's report shall refer to his report as amended.

diminishment in value of the subject property with mitigation costs, and the value of the area directly affected by the easement."

In his report, using comparable sales data and examining the income attributable to the subject property, Sexton appraises the "before easement" value of the property at $2.7 million. The Government does not challenge this appraisal.

Next, in calculating his first element of just compensation, Sexton addresses the 3.94 acres directly affected by the easement. Sexton opines that due to the nature of the powerline easement, this area will have no further utility to the owner and no feasible alternative use. As such, he opines that the only fair compensation for this area is its fair market value. In calculating this value, Sexton opines that if separated from the rest of the property being operated as a golf course, the subject 3.94 acres would be marketed as residential developable land, and the proper measure of fair market value of this area would be as residential use. Using comparable sales of residential properties, Sexton appraises the fair market value of the 3.94-acre easement area at $99,000.

In calculating his other element of just compensation -- being the diminishment in value of the remainder of the subject property with mitigation costs – Sexton first addresses the mitigation costs. Sexton opines that a reasonable response to the negative aesthetic impact of the powerline easement will be landscaping work and fencing to mitigate that damage, which work, according to quotes provided, will cost $407,886.04. Sexton also states that Golf, Inc.'s planned expansion of a maintenance facility (located outside the easement area) will no longer be feasible due to the easement, and that Golf, Inc. will need to acquire additional land (approximately 6 acres) for the relocation and expansion of the maintenance facility. Sexton estimates the cost of acquiring a compatible, adjacent 6-acre tract to be $150,000, and he

estimates the cost of replacing the existing maintenance facility to be $451,535.00. These figures bring Sexton's calculation of total mitigations costs to the sum of $1,009,421.04.

Finally, Sexton addresses the incurable damage to the remainder of the property that he believes will result from the easement. Sexton opines that the golf course will lose patrons, possibly permanently, during construction of the powerline and installation of the mitigation measures and also due to the permanent loss of aesthetic appeal caused by the powerline. Sexton opines that this loss of patrons will result in a loss of income, which will result in a corresponding loss in value of the property. Sexton estimates there will be a loss of 10% of rounds played at the golf course, and that any fee reduction by the owner to retain patronage would likewise approximate 10% per round. As such, Sexton estimates a loss in value of 10%, resulting in an "after easement" value of the property, after installation of the mitigation measures, of approximately $2.4 million, or a reduction in value of $300,000.

In the concluding "Just Compensation" section of his report, Sexton reiterates, "Just Compensation was calculated by adding the diminishment in value of the subject property with mitigation costs, and the value of the area directly affect by the easement." By adding the diminishment in value of the subject property ($300,000) with mitigation costs ($1,009,421.04), and the value of the 3.94-acre easement area ($99,000), Sexton calculates just compensation to be the total sum of $1,408,421.04, rounded down to $1.4 million. Sexton also provides a calculation of the "after easement" value of the subject property in the amount of $1,291,578.96, which is simply his appraised "before easement" value less the sum of his estimates of the referenced elements of just compensation.

In seeking the exclusion of Sexton's opinion testimony at trial, the Government argues that Sexton's opinion is unreliable, both in its methodology and in the facts upon which it is

based, for a number of different reasons. The Government's primary argument is that Sexton's methodology is unreliable and differs from the required methodology for federal condemnation proceedings in the Fifth Circuit, and that his opinion should be excluded on that basis. The court agrees and discusses the Government's primary and alternative arguments in turn below.

### A. Sexton did not use the "before-and-after" valuation methodology that is required in federal condemnation proceedings in the Fifth Circuit.

Federal courts have long held that an appropriate measure of damages in a partial taking case is the difference between the value of the parent tract before the taking and its value after the taking. *United States v. 8.41 Acres of Land, More or Less, Situated in Orange County, State of Texas,* 680 F.2d 388, 392 (5th Cir. 1982) (citing cases). "When the property interest taken from a parent tract is merely an easement, the proper measure of damages is still the before-and-after method of valuation, expressed as the difference between the market value of the land free of the easement and the market value as burdened with the easement." *Id.* at 392. As the Fifth Circuit recognized in *8.41 Acres of Land*, legal scholars have noted at least one other method by which just compensation in partial taking cases can be ascertained, that method computing damages as "the value of the actual land taken plus the diminution in the value of the remaining land in the parent tract." *Id.* at 392 n.5 (citing 4A NICHOLS, THE LAW OF EMINENT DOMAIN § 14.31 (rev. 3d ed. 1981)). The Fourth Circuit allows this other method and Texas law requires it. *Id.* "The applicable federal law in the Fifth Circuit, however, requires the *exclusive* use of the before-and-after method of valuation." *Id.* (emphasis added).

Using the before-and-after method of valuation, compensation is "determined by comparing the fair market value of the entire tract affected by the taking before and after the taking; that is, it should be equivalent to the sum of money obtained by subtracting the fair market value of what remains after the taking, from the fair market value of the whole

immediately before the taking." *Id.* (quoting *Transwestern Pipeline Co. v. O'Brien,* 418 F.2d 15, 21 (5th Cir. 1969)). In the present case, because Sexton's calculation of just compensation was not obtained using this required method and was obtained, instead, by calculating the sum of the value of the area directly affected by the easement, the diminishment in value of the remainder, and mitigation costs, the plaintiff contends Sexton's testimony should be excluded. The court agrees.

Golf, Inc. urges this court to follow the non-binding decision of the U.S. District Court for the Southern District of Texas in *United States v. 5.65 Acres of Land in Starr County, Texas,* No. 7:08-cv-00202, 2020 WL 5105206, at *8 (S.D. Tex. Aug. 31, 2021), a fee simple partial taking case in which the United States argued that the defendant's expert's valuation of just compensation was unreliable and should be excluded because he did not use the required before-and-after method (or "Federal Rule") but instead used the "value-plus-severance" method (or state rule). In response, the defendant argued that the two methods are equivalent and lead to the same result. The court agreed, citing the method used by the Fourth Circuit, which "measures damages as the fair market value of the parcel actually taken *plus* the severance damages, if any, to the portion of the tract retained by the landowner." *Id.* (quoting *United States v. 97.19 Acres of Land,* 582 F.2d 878, 881 (4th Cir. 1978) (emphasis added in *5.65 Acres of Land in Starr County*)). The court found that the "before-and-after" approach and the "value-plus-severance" approach are in substance just different ways of expressing the same idea: "that the landowner in a partial takings case is entitled to just compensation for the lost value to all of his land, not just the parcel actually taken." *Id.* (quoting *United States v. Easement and Right-of-Way Over 6.09 Acres of Land,* 140 F.Supp.3d 1218, 1245 (N.D. Ala 2015)). Noting that the defendant's expert testified -- as Sexton did in this case -- that the appraisal method he used and

the before-and-after method would result in the same compensation estimate, and concluding that the two appraisal methods are functionally equivalent, the court declined to exclude the expert's testimony. *Id.* The same court later followed this holding in *United States v. 4.620 Acres of Land in Hidalgo County, Texas,* 576 F.Supp.3d 467, 479 (S.D. Tex. 2021) (stating value-plus-severance method of calculating damages is functional equivalent of before-and-after method) (citing *5.65 Acres of Land in Starr County,* 2020 WL5105206, at *8). However, this court finds these decisions on this particular issue unpersuasive and will decline to follow them for three reasons.

First, they appear to contradict the Fifth Circuit's directive in *8.41 Acres of Land in Orange County,* in which the Fifth Circuit expressly acknowledged the Fourth Circuit's use of the value-plus-severance valuation method and stated nonetheless, "The applicable federal law in the Fifth Circuit, however, requires the *exclusive* use of the before-and-after method of valuation." 680 F.2d at 392 n.5 (emphasis added). Golf, Inc. cites no authority indicating that the Fifth Circuit's rule has changed.

Second, as discussed further below, according to Sexton's own report, the value-plus-severance valuation method tends to "double count" damages, especially in cases such as the present case involving the imposition of an easement; and third, even if this court were to consider allowing the use of the value-plus-severance valuation method, Sexton did not use *only* value plus severance damages in calculating just compensation – he also opined on mitigation costs (or cost-to-cure damages) and included those sums in his computation of just compensation. This was not done in the cases that Golf, Inc. urges this court to follow. Golf, Inc. cites no authority from any jurisdiction approving the use of such a method, and as discussed below, Sexton's own report appears to advise against using it.

In his report, Sexton discusses three different methodologies, or "rules," that may be used for real estate damage valuation.[2]   According to the report, one conventional rule is the "Deductive Rule," commonly known as the "Federal Rule," the "Before and After Rule," or the "Difference Between Fair Market Value of the Property Before and After the Damage Rule." The report states this rule is used by the federal government and some state jurisdictions to guide the amount of compensation for partial property acquisitions resulting from damages for public works projects, and its strength is that it is less prone to "double count" damages.

According to Sexton's report, another conventional rule is the "Adductive Rule," also known as the "State Rule," or the "Value of the Take Plus Damages Rule."   The report states this rule uses "adductive" logic by "adding" the value of the damaged portion of a property with the value of the damages to the remainder to estimate total damage compensation.   According to the report, the most frequently encountered weakness of this rule is its tendency to "double count" damages, "especially when estimating the loss in value, if any, from the imposition of easements on a property."   In other words, the value-plus-severance method is an unreliable method of determining just compensation in cases such as the present one.

According to Sexton's report, there is a third, newer rule which he calls the "Reductive Rule," also known as the "Stigma Rule," under which the "unimpaired value" of a property is reduced by costs-to-cure the damages rather than extracted from the market.   The report states that this rule may be applicable in cases where there has been a relatively rapid and often incurable decline in a property's value.   According to the report, this rule has not been adopted

---

[2]  As the Government points out, this section of Sexton's report relies heavily on the text of an article, "Three Rules for Forensic Real Estate Damage Valuation: Deductive, Adductive, or Reductive Rule," by Wayne C. Lusvardi and Charles B. Warren (Urban-Real Property, Spring 2001).

by any political jurisdiction for condemnation purposes.

In the present case, determining which of these rules – or methods – Sexton used in making his valuation is easier said than done, due in part to the fact that Sexton's report does not expressly say. Equally unhelpful is Sexton's testimony during his deposition, during which there was a focus on whether he used the deductive rule or the reductive rule. In the deposition excerpts submitted to the court, Sexton testified that the deductive rule and the reductive rule are different methodologies. Curiously, he also testified that he is not aware of either methodology being recognized as a generally accepted appraisal methodology in federal condemnation proceedings (even though in his report he states the deductive rule, also known as the "Federal Rule," is used by the federal government in partial takings for public works projects). Asked if he used the reductive methodology, he answered, "Yes," and asked if he used any other methodology besides the reductive methodology, he answered, "Not that I recall." Counsel then asked, "And just to make sure, you did not use the deductive rule, the before and after rule?" Flatly contradicting the testimony that he had just given, Sexton answered, "I did use that. It's required." Sexton's deposition testimony as to which method he used cannot be relied upon.

In Sexton's report, the clearest statement describing the methodology he used in valuating just compensation is his statement, "Just Compensation was calculated by adding the diminishment in value of the subject property with mitigation costs, and the value of the area directly affected by the easement." Clearly, this is not the deductive rule, also known as the "Federal Rule" or the before-and-after rule, which Sexton's report states is the methodology to be used in federal condemnation proceedings.[3] Sexton's methodology appears instead to have

---

[3] As to why Sexton chose not to use the Federal Rule in this case, the Government suggests the reason is that, as he testified during his deposition, Sexton was not aware of the ownership structure of TVA, and his report indicates that he considered TVA a private utility company. Of

elements both of the adductive rule -- which calculates just compensation by adding the value of the damaged portion of the property with the value of the damages to the remainder (and which Sexton's report states has a tendency to double count damages resulting from the imposition of easements on property) -- and of the reductive rule – which accounts for cost-to-cure or mitigation damages.   In his report, however, Sexton states that the different methods discussed in the report "are for the most part not interchangeable and the synthetic mixing of these rules is at a minimum illogical and at maximum misleading."   It appears that in reaching his opinion of just compensation, Sexton has done precisely what his report warns is unreliable, illogical and/or misleading.

The court finds that Sexton's methodology is unreliable and fails to comport with the required methodology for determining just compensation in federal partial taking cases in the Fifth Circuit.   This renders Sexton's opinion inadmissible.   Although it is therefore not necessary to address the Government's alternative arguments challenging Sexton's opinion, the court will do so.

**B.  Sexton violated the unit rule by determining the "after take" value of the 3.94-acre easement area as a separate tract instead of valuing the entire property as a whole.**

When determining the market value of property in partial taking cases, the court must "value the property as a whole rather than the sum of the various uses to which it has been placed."   *8.41 Acres of Land in Orange County,* 680 F.2d at 395.   "The normal procedure for awarding compensation for an easement is to determine the highest and best use of the *entire* acreage within the property lines of the parent tract and then to calculate the difference between

---

course, the condemnor in this case is the United States, and TVA is a corporation wholly owned by the federal government.

the market value of the tract before and after the taking." *United States v. 4.27 Acres of Land*, 271 F. App'x 424, 425 (5th Cir. 2008) (emphasis added). *See also* "Uniform Appraisal Standards for Federal Land Acquisitions" (aka "The Yellow Book"), § 1.2.7.3.2 (Interagency Land Acquisition Conference 2016) ("The unit rule requires valuing property as a whole rather than by the sum of the values of the various interests into which it has been carved."); "Uniform Standards of Professional Appraisal Practice," Standard Rule 1-4(e) (The Appraisal Foundation 2020-2021 ed.) ("An appraiser must refrain from valuing the whole solely by adding together the individual values of the various estates or component parts."). "[S]eparately appraising individual components of value and adding them together to reach the whole value is a piecemeal approach which can easily result in double-counting and is impermissible." *United States v. 2,175.86 Acres of Land, More or Less, Situate in Hardin and Jefferson Counties, Tex.,* 687 F.Supp. 1079, 1088 (E.D. Tex. 1988).

In the present case, instead of appraising the "after take" value of the entire 212.31-acre parent tract, Sexton calculated just compensation by determining the value of the 3.94-acre easement area as a separate tract and then adding the value of that tract to the damages to the remainder with mitigations costs. The Government argues this violates the unit rule and allowed Sexton to improperly reach a higher damages opinion. The court agrees.

Golf, Inc.'s only response to this argument is that Sexton did not violate the unit rule because he explained how the subject 3.94 acres would be used as residential property, despite a covenant that the larger parcel be maintained as a golf course. Although Golf, Inc. cites no supporting authority, the Fifth Circuit has held that three factors are particularly helpful in determining whether property taken is a separate tract or part of a single, larger tract for purposes of calculating just compensation: physical contiguity, unity of ownership, and unity of use. *8.41*

*Acres of Land in Orange County,* 680 F.2d at 393; *4.27 Acres of Land,* 271 F.App'x at 426 (discussing "separate economic unit" exception to unit rule). "When an owner actually uses parts of what would otherwise constitute a unified tract for different or separate purposes, however, the parts may be held to be functionally 'separate' tracts, though they are not physically separate." *8.41 Acres of Land in Orange County,* 680 F.2d at 393. "Integrated use is the key test for unity of a tract." *Id.*

In the present case, the referenced three factors all weigh in favor of finding the 3.94-acre easement area to be part of the larger tract and not a separate tract, and Golf, Inc. offers no evidence or argument on these factors to the contrary. The 3.94-acre tract is contiguous to the larger tract, has unity of ownership with the larger tract, and has not been used for any purpose apart from Golf, Inc.'s operation of a golf course on the larger tract.

Although the Fifth Circuit has allowed evidence of the highest and best "potential" use of land, as well as its existing use, for purposes of determining whether a tract is separate and independent or part of the whole, potential use may be considered "only if there is a 'reasonable probability' the lands in question will be put to that use in the reasonably near future." *Id.* at 394 n.8. Even then, it is only one factor to be considered in determining the "unity" issue along with the factors of contiguity, unity of ownership, and existing use. *Id.* Where the proffered "potential" use of the land is speculative and the landowner has demonstrated no existing plan to so use the land, the potential use is clearly outweighed by the existing use, unity of legal title and contiguity. *Id.* "To allow a district court under such speculative and imprecise conditions to 'sever' a parcel for the purpose of awarding a very high compensation award would unfairly strain the federal treasury." *Id.* (reversing district court's categorization of condemned strip of land as separate parcel where landowners merely hoped it would be acquired for other purpose

but had taken no steps to sever it from rest of property and had no existing plans to use it for other purpose).

  In the present case, there is no evidence that Golf, Inc. even hoped that the 3.94 acres directly affected by the easement would be acquired for residential use – let alone evidence that Golf, Inc. had taken steps or had plans to sever that parcel from the larger tract. The court concludes that the unit rule applies in this case and that Sexton's opinion is unreliable because in calculating just compensation, he violated the rule by valuing the 3.94-acre easement area as a separate tract and not as part of the unified whole of the property.

### C. Sexton improperly determined that the highest and best use of the 3.94-acre easement area is residential use.

  In determining market value in a condemnation proceeding, the court "must look not only at the present use of the property, but also at the highest and best use for which the property is adaptable and needed." *841 Acres of Land in Orange County,* 680 F.2d at 395. "There is a presumption, however, in favor of the existing use of the land which can only be overcome if the landowner can show the reasonable probability that the property, at the time of taking, was adaptable and needed, or likely to be needed in the near future, for the potential use." *Id.* at 394-95. The landowner must also show a reasonable probability that a potential use would be allowed under applicable regulatory restrictions. *United States v. Land, 62.50 Acres of Land More or Less, Situated in Jefferson Parish, State of Louisiana,* 953 F.2d 886, 891 (5th Cir. 1992). If the court finds that the applicable regulatory restrictions preclude the proffered use, he must "exclude evidence of that use from the just compensation determination." *United States v. 320.0 Acres of Land, More or Less, in the County of Monroe, State of Florida,* 605 F.2d 762, 818 (5th Cir. 1979). The landowner must also show that the proffered use is "reasonably practicable." *Id.* at 826. A landowner satisfies this burden by presenting evidence that the

proffered use is "economically feasible." *United States v. 33.90 Acres of Land, More or Less, Situated in Bexar County, State of Texas,* 709 F.2d 1012, 1015 (5th Cir. 1983). The trial judge has the responsibility "to screen the proffered potential uses and exclude from jury consideration those which have not been demonstrated to be practicable and reasonably probable uses." *320.0 Acres of Land in Monroe County,* 605 F.2d at 815.

In the present case, whereas at the time of taking the 212.31-acre parent tract was used as a golf course and any other use is prohibited by restrictive covenants established by declaration, Sexton opined that the highest and best use of the 3.94 acres directly affected by the easement is residential, and he valued it as such when calculating just compensation. The Government argues that aside from violating the unit rule, Sexton's opinion on the highest and best use of this tract is unsupported by evidence that residential use of the property is legally permissible under the restrictive covenants or economically feasible given that the easement area lies in a flood zone.

In response to the Government's "legally permissible" argument, Golf, Inc. has submitted evidence that certain parcels subject to the restrictive covenants were sold and used for residential development. Therefore, Golf, Inc. argues, residential use of the 3.94-acre easement area is clearly legally possible. The Government counters by pointing out that the submitted deeds do not reference or extinguish the subject restrictive covenants and that under Mississippi law, a mere conveyance does not extinguish a covenant that runs with the land, the implication being that notwithstanding the residential use of the conveyed parcels, there is no evidence that their residential use is legally permitted. However, the court has doubts that a restrictive covenant attached to a property by declaration constitutes a "regulatory restriction" that legally prohibits a proffered use. Although such a covenant may certainly be enforced as between

private parties, there is no evidence in this case that its violation is illegal or unlawful.

Nonetheless, even if Golf, Inc. can satisfy its "legally permissible" burden, it has not satisfied its "economically feasible" burden.

In his report, Sexton supports his opinion on the highest and best use of the subject 3.94-acre tract as follows:

> Based on the subject property's location within an existing residential structured subdivision, it is felt that the proper way to determine market value of the section of the subject property directly affected by the proposed easement would be as residential use. It is felt that if the parcels directly affected by the easement were separated from the existing golf course, they would be marketed as residential developable land.

Sexton's report makes no mention of the economic feasibility of developing the subject tract -- which lies in a flood plain -- for residential use. During his deposition, in explanation of why he believes the subject tract's location in a flood zone would not affect its highest and best use as residential property, Sexton testified, "Because the – the cost of homes in the adjacent residential development is such that a developer would probably take a serious look at this to determine whether or not it would be feasible to take it out of a flood hazard for residential use." Of course, Sexton's belief that a developer would "probably take a serious look" at the flood zone property to determine "whether or not" it would be feasible to develop it for residential use is hardly affirmative evidence that such a use is reasonably practicable or financially feasible, and there is no other evidence in the record supporting such a finding. Golf, Inc. has failed to meet its burden in this regard, and Sexton's opinion valuing the 3.94-acre tract as residential property should be excluded.

**D. Sexton improperly valued the taking of the 3.94-acre easement area as a fee take.**

"[W]here only an easement is taken, the fact that the fee remains in the landowner must be taken into consideration, the entire fee or rental value not being recoverable." *United States*

*v. 2,648.31 Acres of Land, More or Less, in the Counties of Charlotte and Halifax, Va.,* 218 F.2d

518, 523 (4th Cir. 1955) (quoting C.J.S., Eminent Domain, § 152, p.1011). Specifically with

respect to powerline easements, this rule has been explained as follows:

> Where only an easement is acquired it is not proper to allow the full fee value of
> the land within the easement area. The fact that the fee remains in the landowner
> must be taken into consideration. Where any substantial enjoyment of the land
> still remains in the owner, it is treated as a partial instead of a total divesting of his
> interest in the land. The rights remaining in the landowner are usually very
> substantial where only a power line easement is taken. In such a situation the
> property owner may make use of the property which is not inconsistent with its use
> for the purpose for which it was taken, and subject to the paramount right of the
> Government, he may cultivate the land, pass along and across it, fence and cross-
> fence it, and generally use it in any way which does not affect the rights of the
> Government. The title to trees and shrubbery, grass, underlying minerals or oil,
> and springs within the right-of-way remain in the owner.

*United States ex rel. Tenn. Valley Auth. v. Harralson,* 43 F.R.D. 318, 323 (W.D. Ky. 1966)

(internal footnote citations omitted); *Instructions to Commissioners Under Rule 71A,* 61 F.R.D.

503, 517 (1974) (stating same).

In the present case, Sexton valued the taking of the 3.94-acre easement area at 100% of

his appraisal of its market value, thereby valuing the taking as a fee taking, which he admitted

during his deposition. The Government argues this is improper, and the Government correctly

points out in its rebuttal brief that Golf, Inc. failed to respond to this argument. The court agrees

with the Government and finds that Sexton's opinion valuing the take of the 3.94-acre easement

area as a fee take is improper and should be excluded.

### E. Sexton improperly opines that Golf, Inc. should be compensated for frustration-of-purposes-damages.

In condemnation proceedings, "fair market value does not include the special value of

property to the owner arising from its adaptability to his particular use." *United States v. 564.54*

*Acres of Land, More or Less, situated in Monroe and Pike Counties, Penn.,* 441 U.S. 505, 511,

99 S. Ct. 1854, 60 L.Ed.2d 435 (1979) (holding church entitled only to fair market value of condemned property and not to compensation for cost to develop substitute facilities at new site). "[I]t is not at all unusual that property uniquely adapted to the owner's use has a market value on condemnation which falls far short of enabling the owner to preserve that use." *Id.* at 513. Nontransferable values arising from the owner's unique need for the property are not compensable. *Id.*

As to future business plans or opportunities, "[t]here are numerous business losses which result from condemnation of properties but which are not compensable under the Fifth Amendment." *United States ex rel. Tenn. Valley Auth. v. Powelson,* 319 U.S. 266, 281, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943) (holding hydroelectric power company not entitled to compensation for frustration of its plan to use condemned land together with other property for hydroelectric project). The government must pay only for what it takes, "not for the opportunities which the owner may lose." *Id.* It is well settled that, "Frustration and appropriation are essentially different things." *Id.* (quoting *Omnia Commercial Co., Inc. v. United States,* 261 U.S. 502, 513, 43 S.Ct. 437, 67 L.Ed. 773 (1923)).

In the present case, because Golf, Inc. planned to expand its maintenance facility (which lies outside the 3.94-acre easement area) into the easement area, and also because Golf, Inc. planned to hire more staff and purchase more equipment which would be stored in the easement area, Sexton's report states that the Government's powerline easement will render infeasible Golf, Inc.'s planned expansion of its maintenance facility in its present location. As such, Sexton opines, in addition to the other elements of damages he calculates, Golf, Inc. should also be compensated for the $150,000 cost of acquiring additional land in order to relocate and expand the maintenance facility, as well as the $451,535 cost of replacing the existing

maintenance facility.   The Government argues that the recovery of these frustration-of-purpose damages is not permissible.   The court agrees.

Fair market value does not include the special value that the 3.94-acre easement area had to Golf, Inc. arising from its adaptability to Golf, Inc.'s particular use – to facilitate the expansion of the maintenance facility.   The fact that the easement will frustrate Golf, Inc.'s plan to expand the maintenance facility does not entitle Golf, Inc. to compensation greater than the fair market value of what was taken.

In response to the Government's "frustration-of-purpose" damages argument, Golf, Inc. points to evidence that the loss of its ability to stage equipment in the 3.94-acre easement area will eliminate the utility of the maintenance facility, essentially characterizing the imposition of the easement as a taking of the maintenance facility for which Golf, Inc. should be compensated. However, even assuming *arguendo* that the Government has taken the land on which the maintenance facility lies (it has not), "the possibility that the cost of a substitute facility exceeds the market value of the condemned parcel would not justify a departure from the market value measure." *United States v. 50 Acres of Land,* 469 U.S. 24, 30, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984).   Golf, Inc. and its expert appraiser Sexton would have the Government pay not only the cost of a substitute maintenance facility and equipment staging area (in addition to the value of the existing equipment staging area), but also the cost of property to allow the relocation and planned *expansion* of the maintenance facility.   This is improper.   "The substitute-facilities doctrine, as applied in this case, diverges from the principle that just compensation must be measured by an objective standard that disregards subjective values which are only of significance to an individual owner."   *Id.* at 30, 35 (holding city whose landfill property was condemned not entitled to cost of acquiring substitute property and developing larger landfill).

Sexton's substitute-facilities opinion improperly includes the special value of the 3.94-acre easement area to Golf, Inc arising from its adaptability to Golf, Inc.'s particular use and should be excluded.

**F. Sexton's calculation of "cost to cure" damages should be excluded.**

Here, the Government cites the Fourth Circuit case of *United States v. 2.33 Acres of Land, more or less, Situate in Wake County, State of N. C.,* for the principle, "When the cost of curing the injury to the remainder is less than the outright diminution in its value uncured, the government may pay the cost of cure." 704 F.2d 728, 730 (4th Cir. 1983). The Government argues that Sexton's opinion that Golf, Inc. should be compensated for the expected costs of $407,886.04 for landscaping and fencing to mitigate the aesthetic impact to the remainder of the property after imposition of the powerline easement should be excluded because these cost-to-cure damages exceed the $300,000 Sexton estimates to be the diminution in value to the remainder.

In response, Golf, Inc. states that in addition to the landscaping and fencing costs, its cost-to-cure damages include the $601,535 cost of acquiring substitute property for the relocation and expansion of the maintenance facility and of replacing the existing maintenance facility, for a total sum of cost-to-cure damages in the amount of $1,009,421.04. Golf, Inc. asserts that the diminished value of the remainder of the property is comprised of all the elements of damages calculated by Sexton (including the $99,000 value of the 3.94-acre easement area, the cost-to-cure damages, and the $300,000 incurable damage to the remainder) totaling approximately $1.4 million. Golf, Inc. argues that the cost-to-cure damages are therefore recoverable because they do not exceed the total diminished value of the remainder.

The court notes that the "cost-to-cure" case cited by both parties was decided by the

Fourth Circuit which, as previously discussed in this opinion, allows the "value-plus-severance" methodology of calculating just compensation, whereas the Fifth Circuit requires the exclusive use of the "before-and-after" methodology. The "cost-to-cure" principle appears to be a corollary to the "value-plus-severance" methodology whereunder the Government may pay the cost-to-cure damages if they do not exceed the severance damages. This court is unaware of any decision within the Fifth Circuit – and the parties cite none – applying this principle as an alternative to the "before-and-after" methodology. Further, it appears that even under this "cost-to-cure" principle, cost-to-cure damages may be paid *in lieu* of severance damages -- not as an element of and in addition to other elements of severance damages.

As the Government points out in rebuttal to Golf, Inc.'s argument, Sexton's opinion that Golf, Inc. should recover *both* the value of the 3.94-acre easement area where Golf, Inc. stored equipment and planned to expand its maintenance facility *and* the cost of acquiring substitute property where Golf, Inc. can store its equipment and replace and expand its maintenance facility improperly advocates a double recovery. Even the Fourth Circuit case cited by the parties for the "cost-to-cure" principle disallowed such a recovery. *2.33 Acres of Land in Wake County,* 704 F.2d at 730 (disallowing landowner's double compensation for both value of improvements taken and cost of replacing them). Sexton's opinion of "cost to cure" or mitigation damages is improper and should be excluded.

### F. Sexton's *ipse dixit* opinion of the incurable damages to the remainder of the property is unsupported by facts or data.

As stated previously herein, "[w]here an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.,* 555 F.3d 383, 388 (5th Cir. 2009). Expert opinions that are unsupported by data, are self-contradicted, or are based on incorrect assumptions are to be excluded. *See Guile v. United States,* 422 F.3d 221,

227 (5th Cir. 2005).   Although trained experts commonly extrapolate from existing data, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."   *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *see also Guile,* 422 F.3d at 227 ("A claim cannot stand or fall on the mere *ipse dixit* of a credentialed witness.") (quoting *Archer v. Warren,* 118 S.W.3d 779, 782 (Tex. App. – Amarillo 2003).   "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."   *Gen. Elec. Co.,* 522 U.S. at 146.

In the present case, Sexton opines that imposition of the easement will result in a loss of 10% of rounds played at the golf course, that any fee reduction by the owner to retain patronage would likewise approximate 10% per round, and that the property will therefore suffer a 10% loss in value.   Sexton's report contains no data upon which he relied in reaching this opinion. During his deposition, Sexton testified that there is no such data, that he has no experience valuing powerline easements that cross a golf course, and that this aspect of his opinion is "based on the fact that I play golf."   The plaintiff argues that this *ipse dixit* opinion is unsupported by sufficient data and should be excluded.   The court agrees.

"[T]he existence of sufficient facts and a reliable methodology is in all instances mandatory."   *Hathaway v. Bazany,* 507 F.3d 312, 318 (5th Cir. 2007).   "[W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Id.* (quoting *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 424 (5th Cir. 1987)).   The complete lack of data supporting Sexton's opinion as to the incurable 10% reduction in value of the remainder of the property renders the opinion speculative, subjective, unreliable and inadmissible.

## Conclusion

For these reasons, the Government's motion to exclude the opinion testimony of William Sexton [ECF #67] is GRANTED.

This, the 9th day of November, 2023.

/s/ Roy Percy
UNITED STATES MAGISTRATE JUDGE